**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**CATHY DAVIS,**

    **Plaintiff,**

v.

**VALDOSTA FAMILY MEDICINE ASSOCIATES, P.C.,**

    **Defendant.**

_____/

**CASE NO.:
GA. BAR NO.: 121837**

# COMPLAINT

Plaintiff, Cathy Davis, hereby sues Defendant, Valdosta Family Medicine Associates, P.C., and alleges:

## NATURE OF THE ACTION

1. This is an action brought under the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended, and its associated damage provisions, as well as the Age Discrimination in Employment Act (ADEA).

2. This action involves claims which are, individually, in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs and interest.

## THE PARTIES

3. At all times pertinent hereto, Plaintiff, Cathy Davis, Candace, has been a resident of the State of Georgia and was employed by Defendant. Plaintiff is a member of a protected class due to her gender and age.

4. At all times pertinent hereto, Defendant, Valdosta Family Medicine Associates, P.C., has been organized and existing under the laws of the State of

Georgia. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

5.   Plaintiff has satisfied all conditions precedent to bringing this action in that Plaintiff was fired on or about December 14, 2022. She filed a charge of discrimination with the Equal Employment Opportunity Commission 90 days later, on March 14, 2023, EEOC Case No. 410-2023-05242, and received or is eligible to receive her right to sue notice. This action is timely filed thereafter.

## STATEMENT OF PERTINENT FACTS

### OVERVIEW

### *Summary of the Case*

6.   This is an employment discrimination case. The Defendant (VFMA), chose to fire one of its three computer tomography (CT) technicians. And it chose Ms. Davis, the oldest, most experienced and most versatile CT tech, a manager with a spotless 17-year career there. Indeed, Ms. Davis was the CT Department's consummate utility player and cross-functional expert.

7.   And neither her pay (which despite her long tenure was still within a few dollars of even the newest CT tech) nor her performance were factors, VFMA admits. The two grounds upon which it has staked its defense - that she wasn't versatile, and didn't have schedule flexibility - are demonstrably false, as explained below. Thus, her selection had all the markings of discriminatory decision-making

because no reasonable employer, in deciding to reduce the number of employees in the mission-critical CT department, would choose the *most* experienced, *most* versatile, and *most* skilled employee to turn loose. VFMA clearly favored the newly-hired, younger and less qualified male, as well as a younger female.

### *The Practice, The Positions, and The Key People*

8. VFMA a is a Georgia professional corporation with its principal place of business on N. Oak St. in Valdosta, GA. It is primarily engaged in the practice of family medicine. At times relevant to this case, it also operated a walk-in clinic and maintained an on-site lab, where various tests were performed, including blood work, urine tests, drug tests, and various diagnostic testing. It is also an American College of Radiology accredited facility that offers imaging services including CT scans, X-rays, bone density scans, ultrasounds, and echocardiogram services, although, at the time Plaintiff was employed, the only area of imaging that was accredited was the CT Department Plaintiff oversaw. It does not employ radiologists, though, and so must send imaging results out for analysis. It employed about 150 people at the time Plaintiff was terminated.

9. CT Technicians have a critical role. They operate CT equipment, which uses X-ray technology to produce cross-sectional images of the body. These images provide detailed information that helps in the diagnosis and treatment of various medical conditions. CT imaging is used to detect bone and joint problems, identify and monitor cancers, look for internal injuries, evaluate heart diseases, detect vascular diseases, investigate abdominal and pelvic pain, evaluate strokes, tumors,

and other brain conditions, and many more. This work, if not performed correctly, can have irreversible, even fatal consequences.

10. Whatever VMFA's actual reason for eliminating a CT tech position, Plaintiff's age and her gender were clearly factors that led to the decision to choose *her*. Indeed, when being fired, Davis was told that this was actually a good thing, because being unemployed, she could "spend more time with her grandchildren."

11. It is indisputable that (a) she had a flawless work history nearing 20 years in length, (b) had decades more experience in the field of computer tomography specifically and imaging generally, (d) could perform all types of imaging needed by the practice, (e) had successfully managed the unit for about 17 years, and (f) at the time she was fired without warning, she was the only one of the three CT Techs who had no scheduling restrictions or limits.

12. The three CT Techs thus compare as follows, based on information as it is known to Ms. Davis:

| Skill | Plaintiff | Male (Bass) | Female (Starling) |
|---|---|---|---|
| Years at Clinic | 17 | 15 mo. | 22 |
| Management exp. at Clinic | 17 years | 0 | 0 |
| CT Scan Exp. | 36 years | >10 yr est. | 16+/- |
| X-Ray Exp. | Off and on over 36 years | >10 yr est. | 16 +/- |
| Bone Density | 13 years | >1 yr | 22 yrs |
| Scheduling Limits | No | Yes | Yes |

4

| Scheduled to work weekends | No. The Radiology & CT Departments were never open on weekends during Davis' employment. | Same | Same |
|---|---|---|---|
| Nights actually worked | Yes. In fact, Plaintiff was the established "CT late tech" for the walk-in clinic and stayed until last patient was scanned. | Schedule ended by agreement at 5:00 PM due to Bass' family obligations | Schedule ended by agreement at 5:00 PM due to Starling's family obligations |
| Willing to work nights | Yes | No | No |
| Rate of Pay | Same within a few dollars | Same within a few dollars | Same within a few dollars |
| Years employed with Clinic | 17 years | 15 mo.; hired Oct. 2021 | 25 yrs+/- |
| CT Scan certified | Yes | Yes | Yes |
| X-ray Certified | Yes | Yes | Yes |
| Bone density scan certified | No | No | No |
| Willing to work weekends | Yes | Yes | Yes |

### *The Post-Firing Explanations for Davis' Firing*

13. Plaintiff was not given a reason for her firing at the time of termination, other than that it wasn't because of her, and wasn't because of her job performance. Nonetheless, VMFA has now articulated two grounds for ending Ms. Davis' employment. First, it says that in choosing which of the three CT technicians to fire, it prioritized the comparative scheduling availability/flexibility of the three CT Techs.

5

Second, it says it prioritized the three tech's individual willingness to assist the practice in areas beyond the employees' core duties.

14. Neither of these stated reasons is true, meaning they could not possibly be the actual reason for her selection.

### "Scheduling Availability/Flexibility"

### *The Clinic's Assertion*

15. After Plaintiff was fired, VFMA claimed that it needed CT Techs with great scheduling flexibility. It pointed out that VFMA was open seven days a week, and that the urgent care clinic also kept weekend hours, which generated the need for follow-up testing during the coming week. It further asserted that "In order to meet patient demand and provide important medical testing to ill patients on a timely basis, scheduling flexibility is extremely important to VFMA. Consequently, workers with greater availability and scheduling flexibility are highly valued." It claimed the two younger CT Techs had more availability, that both worked Fridays and that the younger, male CT tech had assured VFMA when hired that he could work weekends when needed as well, which offered additional flexibility "and was an important consideration in hiring and retaining him."

### *The Reality About "Scheduling Availability/Flexibility"*

16. First, it is important to point out that the CT Department has never been open on weekends. Which is to say, whatever else was going on within VFMA, the employees within the CT Department (and, more broadly, even those within the Radiology Department) never worked weekends. The CT Department *still* doesn't

open on weekends.[1] And, to date, the remaining CT Techs still do not work late on weekdays and do not work on weekends.

17.     Moreover, the practice did not employ a radiologist, a specialist who must swiftly review scans of a patient who is in the clinic awaiting the result. VFMA used an offsite service. And those radiologists did not work weekends, or perform work for the clinic on weekends.

18.     On top of that, VFMA's own lab wasn't fully open on weekends. Why is that important? If the necessary imaging requires a substance known as "contrast" to be given the patient,[2] the CT department had to check their kidney functions, and that required a test conducted with the assistance of VFMA's lab.[3] Patients suffering unknown conditions that warrant a CT scan sometimes have conditions – such as a burst or ruptured appendix - that pose immediate, life-threatening risks. On weekends, VFMA - without an open lab and without a radiologist to immediately

---

[1] To the extent other elements of the practice are open on weekends and generate an even heavier weekday load for the CT Techs, this undermines VFMA's core claim that it did not have enough work to employ three CT Techs.

[2] https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 ("A special dye called contrast material is needed for some CT scans to help highlight the areas of [the] body being examined. The contrast material blocks X-rays and appears white on images, which can help emphasize blood vessels, intestines, or other structures.")

[3] Contrast agents used in CT scans, particularly iodine-based contrasts, can be hard on the kidneys. These agents are filtered out of the blood by the kidneys and excreted in the urine. If a patient's kidneys are not functioning properly, the contrast material can exacerbate existing kidney problems, and could lead to more severe and lasting kidney damage. Contrast materials can also cause kidney - related complications.

review scans, could not safely serve such patients whether the CT techs were in the office or not. Such patients must go to an emergency room, not to a limited-function clinic unable to read the scan and immediately treat the patient. Even on a normal workday, a patient at the clinic with a burst appendix would be redirected to an emergency-care facility immediately, based on lab and radiologist input.

19. As if that weren't enough to disprove the need for CT techs to regularly work weekends, which they have never done, there is still another reason why this is not true. And that is this: CT scans generally require preapproval by an insurance company. That is all but impossible, if not completely impossible, on weekends.[4]

20. Second, for the entirety of Ms. Davis' employment with the practice, she was the *only* CT tech who had no self-imposed scheduling restrictions. At the time of her firing, Plaintiff was still working a four-day, ten-hours-per-day schedule originally imposed on her because other CT Techs at the time had family needs that restricted their work availability. One was Brandy Brantley, who had a newborn and could no longer work late. The other was Tennile Starling, who also had young children and needed to help them with after-school pickup and activities. Even at the time of her firing, Plaintiff remained the only CT Tech without scheduling limitations. Indeed, Brandon Bass – the newest hire and least-experienced of the

---

[4] In fact, Plaintiff had, sometime in June 2021, been told by Julie Cain, the HR Director, to "gear up for weekend operations within the CT Department." Plaintiff moved full steam ahead to do so, excited at the prospect of expanding her department's capabilities. But she quickly learned of the multiple severe impediments to performing CT scans on weekends: no open lab, no radiologists, and no insurance pre-certifications. Plaintiff reported these findings to Cain for possible workarounds and never heard another word.

three - had at the time of hire told Plaintiff he specifically asked the clinic to work a regular 8-to-5 schedule to take care of his kids and to be able to coach teams. He told Plaintiff he had previously worked at South Georgia Medical Center and had "crazy hours" there unsuitable for normal family life, and that was why he took the job at the clinic.  Tennile Starling had to leave at mid-day at least one day a week for her childrens' activities and still does.

### *The Reality About "Versatility"*

21.    The other justification VFMA gave for firing Ms. Davis is that she wasn't as "versatile" as the two younger CT Techs.  It asserted, as a post-firing explanation, that there were times when other imaging departments required additional assistance due to higher-than-normal demand, worker absences, or other reasons. It claimed the two younger CT Techs had demonstrated a willingness to assist with both X-rays and bone density scans when needed. (While X-rays are done every day, bone density scans have long been done just a few days a week.) In contrast, Defendant claimed Plaintiff refused to assist in other imaging needs. This is also false.  In fact, Plaintiff work in the bone-density scanning area from 2009 to 2020 every Tuesday morning and afternoon, according to which day Ms. Starling had to leave early to care for her children. This was after one of the providers actually attempted to restrict Plaintiff's work in bone density, telling her that she could leave the CT department for that period of time only during the week.

22.    Plaintiff helped in imaging needs outside her specific CT tech responsibilities many times in the past, whenever needed, and had never refused.

9

She managed the CT department and had never engaged in such behavior. And she was an expert in imaging. She also trained other CT Techs and indeed helped train them on other forms of scans. Most CT technologists have the fundamental skills and training to perform X-rays and bone density scans (DXA or DEXA scans), as these are part of the core radiological technologist skill sets. Indeed, within Defendant and in most clinical settings, technologists cross-train in different modalities. In most clinical settings, and here, CT technologists receive on-the-job training to perform bone density scans and regular X-rays because of the need for staff to be versatile. With respect to bone density scans (DXA/DEXA) in particular, the technical skills for performing these scans have much in common with other radiographic techniques. Plaintiff had in fact previously performed bone density scans and X-rays. Her skill set was current and she was capable of performing both. She performed them whenever asked and never refused.

23. Whatever VFMA's claimed reasons for eliminating one of the three CT tech positions, it chose Ms. Davis because she was the oldest of the three and female. No employer, in deciding to reduce the number of employees in the mission-critical CT department, would choose the *most* experienced, *most* versatile, and *most* skilled employee to turn loose. An uninformed CT scanning decision, or a poorly-performed scan, could easily cost the life of a VFMA patient. Sometimes decisions must be made quickly. Ms. Davis was a seasoned veteran in this field, had deep expertise, and had proven to be a star performer for approaching two decades. If VMFA were not simply flushing out its oldest female employee, it would have chosen for legitimate business

10

reasons the newly-hired, much younger male, who lacked even a fraction of Ms. Davis's experience.  Or it could have chosen the much younger female, who likewise did not have the same experience as Ms. Davis and had never managed the department.

24. Defendant was simply flushing out the oldest CT Tech.  It did so at a time when it claimed it needed CT Techs more than ever for even more imaging needs, and even more extended hours across the practice group because of the volume of work. Plaintiff was the only one of the three that:

- had managed and supervised the department for years
- had expertise in all types of imaging conducted at the practice;
- had trained others;
- had a schedule that required her to work late into the evening and occasionally arrive early in the morning;
- had shown tremendous scheduling versatility and flexibility in the past, to accommodate the needs of the practice and of other employees;
- and had no scheduling restrictions whatsoever.

## COUNT I
## GENDER DISCRIMINATION

25. Paragraphs 1 through 24 are re-alleged and incorporated herein by reference.

26. This is an action against Defendant for discrimination based upon gender brought under Title VII.

27. Plaintiff has been the victim of discrimination on the basis of Plaintiff's gender in that Plaintiff was treated differently than similarly situated employees of Defendant who are female and has been subject to disparate and poor treatment on the basis, at least in part, of Plaintiff's gender.

28. Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

29. Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

30. Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

31. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a gender-based nature and in violation of the laws set forth herein.

32. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant. The events set forth herein led, at least in part, to Plaintiff's termination.

33.   Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon gender in violation of Title VII.

34.   As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  Plaintiff is entitled to injunctive/equitable relief.

## COUNT II
## AGE DISCRIMINATION

35.   Paragraphs 1 through 24 are realleged and incorporated herein by reference.

36.   This is an action against Defendant for discrimination based upon age brought under the ADEA.

37.   Plaintiff has been the victim of discrimination on the basis of her age in that she was treated differently than similarly situated younger employees of Defendant and has been subject to hostility and poor treatment on the basis, at least in part, of her age.

38.   Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.  Furthermore, Defendant knowingly condoned

and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same. Defendant's known allowance and ratification of these actions and inactions actions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

39. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of an age-based nature and in violation of the laws set forth herein.

40. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.

41. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon age in violation of the ADEA.

42. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. Plaintiff is entitled to injunctive relief under the ADEA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a) that process issue and this Court take jurisdiction over this case;

(b) that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c) enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d) enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e) enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f) award Plaintiff interest where appropriate; and

(g) grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

DATED this 21st day of November 2023.

Respectfully submitted,

/s/ Jim Garrity
Jim Garrity [FBN 0539211]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801
Jim@JimGarrityLaw.com
Secondary emails:
Wanda@mattoxlaw.com

ATTORNEYS FOR PLAINTIFF
